Thank you, Your Honor. Please, the Court. My name is Tim Ford. I represent Jonathan Gentry, who is the petitioner and the appellant in this case. Could you speak up or get close to the microphone? I will. Thank you. Thank you. This case does involve a number of serious constitutional issues, and several of them are complicated by an overlay of hideous corpus procedural issues. But we would submit that the Court really only needs to reach one set of issues in order to dispose of this case, and those are issues that are fairly straightforward and well-established on this record. And they are the issues that arise from the really extraordinary set of violations of the Brady and Napoui principles involving the disclosure of impeaching evidence and the presentation of false testimony by prosecution witnesses in this case. The other issue I think the panel is interested in is the appointment of the expert or non-appointment and the ruling on the penalty phase mitigation evidence. I will address that as well, but I don't know, since that is a penalty phase issue and hopefully is not something. Well, counsel, take my question for what it says. I understand. Absolutely. Don't start telling me whether it's important or not. That's what we're here for, oral arguments, to find out answers to questions that we do have. Sure. I understand that. The Brady-Napoui issues in this case are extraordinary not because of the context in which they arise, because it's one that is quite familiar to this court and this court has dealt with many times, a situation where the prosecutors seek to shore up a weak case by finding prisoners in a jail or prison who are willing to come forward and make claims that the defendant confessed to the crime to them, even though he denied it to everyone else, including the police. In this case, not only confessed to the crime, but confessed to the sexual motivation that was the aggravating circumstance alleged by the prosecution and to a terrible demonstration of lack of remorse by using the word bitch to refer to this 12-year-old victim. Those three informants in this case were the only direct evidence of guilt. This was a circumstantial case and quite an unusual and weak one in many respects compared to similar sorts of cases. But the thing that's extraordinary about this is the extent of these Napoui and Brady violations compared to the other cases this court has dealt with, including the recent case involving Lacey Sivak out of Idaho decided in September of this year. We have two findings by the district court of Brady violations and one Napoui violation, false testimony. One of these witnesses was a police informant who was paid, who was actually hired by the lead detective after he first came forward to other police, nine months supposedly after this statement was made, hired and paid as an informant by Detective Doug Wright, the lead detective in this case, the man who sat through the entire trial, the man who had the victim's family living with him during the penalty phase of this case. And Detective Wright, of course, was the only person who said the critical words that this person, Brian Deisty, had used this word, bitch, in his statements about Jonathan Gentry, even though the only recorded statement that Mr. Deisty made does not include that word. In addition, we have Timothy Hicks, another prisoner who extorted, actually extorted a favor from the prosecutor, Brian Moran, actually said he would not testify unless he was given the assistance of Mr. Moran and with the Indeterminate Sentence Review Board. He additionally, we find out in his testimony anyway below, got a favor from Doug Wright in getting a transfer from McNeil Prison. And he testified falsely about it, testified extensively that he was getting nothing, that his only motivation was altruistic, that he was asking for nothing, that he was getting nothing. And the prosecutor, the very prosecutor who wrote this letter, who made this contact with the Indeterminate Sentence Review Board, said to the jury in closing about Mr. Hicks, he's not getting anything. He didn't ask for anything. He's not getting any favors from anyone. He's not asking for any. Those were lies, and the district court held and found that they were lies. And they, I think, are serious violations in and of themselves of the Brady-Napoui principles. But in addition, we have other evidence found by the district court but held by the district court to be irrelevant, I think, and inadmissible, and quite improperly so. We have notes from the prosecuting attorney, again, Mr. Moran himself, who interviewed Deisty and the other, the third informant, Leonard Smith, and wrote down notes and put in quotes the things that they said to him, and none of those notes ever used this terrible word, bitch. Those notes were not disclosed to the defense. Those prior and consistent statements were not disclosed to the defense. The district court held that they were mental impressions and not discoverable, and that is absolutely contrary to Kiles v. Whitley, in which exactly the same thing happened. And the prosecuting attorney interviewed the man named Beeney, who was the informant in that case, and Beeney made inconsistent statements that omitted facts that he gave in his testimony, and the Supreme Court of the United States held that that was a Brady violation to withhold those notes by that prosecutor. So we have a third, I think, indisputable Brady violation. And in addition, we have the lead detective, the man who put these informants together, the man who did the search warrant on the Gentry household, who came up with this evidence that was subjective to this very novel and unusual DNA testing to get a bunch of factors that were then multiplied together to come up with some kind of a percentage that showed that Jonathan Gentry or someone from that household was involved in that crime. That detective, the glue that held this case together, had been fired from a previous police department for, quote, dishonesty and dishonest, disgraceful, and prejudicial conduct, including the threatening of witnesses who were against his fiancée, who was charged with embezzlement. That fact about that officer was never disclosed to the defense in this case. In addition to that, there is circumstantial evidence that Leonard Smith, the third informant, got the same kind of benefits in an Oregon case that the other two or that Timothy Hicks were demanded and that informants commonly demand. He got a reduced sentence, a reduced charge, and a suspended sentence on a serious first-degree burglary charge here in Oregon a week after he agreed to testify in the Gentry case. But that fact was never developed below because of a decision we think is quite erroneous by the Washington Supreme Court saying that it had not been properly preserved, or at least the district court so held. So it seems to us that these issues are quite clear. The Zivak case, the many cases that this court has decided in the same context, have laid out quite a clear line, and they say that when these kind of violations occur, the district court found the violations, found a Nipuli violation, which means that if the false testimony could have affected the verdict, the false testimony by Timothy Hicks saying, I'm not getting anything, I'm not asking for anything, if that could have affected the verdict, then reversal is, in the Supreme Court's words, virtually automatic. This court has said, well, that doesn't apply necessarily where the falsehood or the impeachment deals with a fact that the jury actually heard. I think recently the James case that this court decided just this year out of Arizona, and we cite this in, I think, our supplemental brief, talks about this, where the informant had actually told the jury, yes, I did get a deal, but there was some question about the timing of the deal, and the court said that is not enough. But when the impeachment or the false testimony deals with a matter that is different from what the jury has actually heard, then prejudice is found and has uniformly been found by this court in many cases, and properly so because of the standard to be applied to these kind of actions. And the district court held contrary to that. The district court said, well, these guys are so unbelievable. They had such bad police or criminal records. They were impeached so heavily that nothing else could have mattered. There's two problems with that. One is the prosecutor stood up and relied on these witnesses over and over and over and over again in closing argument at guilt and critically at penalty also, relied on them in their briefs to the Washington Supreme Court. The Washington Supreme Court relied on these witnesses. Everyone relied on these witnesses until Judge Lasnik said, these witnesses are too incredible to be believed, Deistian and Hicks. But secondly, and more, I think that's one logical flaw. How can it possibly be non-prejudicial and irrelevant to impeach these people on the grounds that they're so incredible nobody could believe them when everybody believed them and when the prosecutor claimed that everything they were saying was true in both the trial court and the appellate court. But also, again, applying the standard that this court has set out, these were facts that were completely different. The prior record of these people, their demeanor, whatever it was that Judge Lasnik believed caused them to be incredible, was a different thing than the rewards that they were given. And that was the exact argument the prosecutor made, especially with regard to Hicks. Yes, he's a bad guy. Yes, he's a liar. Same with Deistian. Yes, he's a racist. He referred to Mr. Gentry as a nigger. But look what they're doing in this case. In this case, they're not getting anything. In this case, they have no motive. In this case, people can change. Well, they hadn't changed. Hicks actually extorted his reward for this testimony. He said, I won't testify unless you help me out with an indeterminate sentence review board. Deistian was acting as a paid police informant. Nobody talked about that. The jury never knew those things. So I would submit that these issues are quite clear and governed by clear circuit precedent. They go to guilt. They go to penalty. They go to the aggravating circumstances. They go to the fact of involvement in the crime. And I think that they moot all the other issues in this case. One issue they don't moot, I would like to speak about briefly. The Court doesn't have any questions about those. This is the ex post facto violation that we submit occurred when the Washington death penalty statute was expanded retroactively, and actually in this case. This is a somewhat confusing issue because of the dual nature of the unfairness of what happened here. But the critical thing to understand, and I hope the Court does understand because it is unusual compared to other states, is the nature of the Washington capital punishment law prior to this case. Washington did not have a run-of-the-mill Florida or Georgia type capital punishment statute. Because of the Bartholomew decision that predated this by a number of years, Washington had an extremely narrow range of evidence that could be considered at the penalty phase. The only thing the prosecutor was allowed to do at the penalty phase was to stand up and say what the defendant's prior criminal record was. That was it. And if the defense came in with mitigation, then that could open the door, provide rebuttal, whatever. But unless the defense did that, the prosecution was absolutely strictly limited to that one fact because under Bartholomew, Bartholomew said the Washington Constitution would be violated by the combination of the broad question we have and broad evidence. So they said it has to be narrow. Is there any authority that supports application of ex post facto to a change in the kind of evidence as opposed to a change in the offense or the quantity of evidence required to establish the offense? Calder v. Bull, Your Honor, that's the case because it's not just the kind of evidence. It's not just that the father of the victim was allowed to testify about something that previously could have only been testified to by a psychiatrist or some other person or put on in some other way. It's not just an evidentiary rule. It was a substantive rule. It told the jury you can now, instead of just being able to consider the defendant's prior record, you can consider the defendant's prior record and victim impact. So it expanded the grounds on which the jury could decide that there was not sufficient mitigating circumstances  It was not just a rule of evidence. Had it just been a rule of evidence, I think Hoff v. Utah would say, no, it's just a question of who can testify to these facts or how these facts can come into court. That's not ex post facto. But it's what facts could come into court and justify a death verdict. And that was dramatically expanded retroactively, and it's confusing because it was done by a combination of a constitutional amendment that was passed by the voters after this crime occurred and then the Washington Supreme Court's decision in this case saying that because of that constitutional amendment, Bartholomew is now changed, the state constitution is now changed, this limit on the grounds that the jury can use to impose death is now removed or expanded at least to include this very significant additional type of evidence. So we believe that that issue, even if, hopefully as we would submit, the court were to find that a new trial on guilt and penalty is required because of the Brady violations, the ex post facto issue would still remain and the court may wish to address it. The court has asked about the ineffective assistance of counsel at penalty issue, and that's one of the ones that I referred to earlier that is quite confusing because of the habeas corpus overlay. The district court held that this issue was defaulted, and it's not clear to me what rule or ground the district court concluded this because what happened was that counsel put the issue of ineffective assistance of counsel, Sixth Amendment, mitigating circumstances, mental health issues, and childhood and background, and said to the Washington Supreme Court, we need investigators, we need a psychiatrist. The Washington Supreme Court issued an order saying, well, we need you to show us why it would be relevant to have a psychiatrist. And the defense, or the petitioner at that time, responded with affidavits from two psychiatrists, with affidavit from an expert witness lawyer, and with briefing that explained exactly why it was highly relevant, and the Washington Supreme Court citing no rule of evidence that said that's not before us, we'll pass it to the merits and we'll talk about it for the benefit of future people. And, by the way, we think that there was really a... What you're complaining about is the failure of the Washington Supreme Court to grant the motion to provide funding, but that's not an issue you're trying to raise in front of us or haven't raised to the district court. It is, I think, that issue. We believe, and this is why it's complicated, we believe there was no default, and because there's no default, there's no need to go to the question of cause. If you did go to the question of cause, one very significant issue is whether this kind of denial of resources in post-conviction is cause, and we would submit it is, and that issue, I think, is right now before the Supreme Court of the United States in a couple of cases. Well, except the proposition there's no default, you've got a tough hole to go through, to thread through, because the Washington Supreme Court did make reference in its decision to the complaint about the failure to provide expert testimony in mitigation. The paper submitted to the Washington Supreme Court in connection with the application for appointment or for funding acknowledged that at that point in time, Petitioner wasn't in a position to establish prejudice under Strickland. So the Washington Supreme Court didn't have a whole lot to look at or to consider, because the Petitioner basically conceded, I don't have anything yet, I want to go out and get more, and the court said no. That's why I say it seems to me the problem is that the funding was denied, but the court did pass on what was in front of it at the time, and unremarkably decided that wasn't enough because the Petitioner had acknowledged it wasn't enough. And I would agree... So there may not be a default, but I don't see how the Washington court decision could be found to be unreasonable based on what it had in front of it. Okay, well, we've got to go backwards a couple of things. If you would agree that there was no default, then the district court was wrong. The district court here erred, and I think that the state has now conceded that in their latest brief. They've said, okay, it was adjudicated. That hasn't changed. It really hasn't helped you very much. Because if the Washington Supreme Court did pass on the merits, it's hard to find anything in their determination that's unreasonable based on the evidence in front of that court because the Petitioner's acknowledged he didn't have enough to establish Strickland prejudice. And this is where we get into the very complicated habeas stuff. The question is whether saying we're denying on the merits is an adjudication on the merits when they specifically say when they're playing this dual role where they're not allowing evidence. And it's actually very complicated because the way it works in Washington, the way it worked then, and I think it still works now, the chief justice is the only judge who rules on these motions ordinarily. We don't even know what evidence the other members of the court had before them. There were declarations. There were memoranda. There was evidence that was unrebutted from two psychiatrists saying based on what I've seen here, I think there's mental health issues that would constitute mitigating circumstances. The Washington court, in its opinion, addresses the motion. It only talks about the ‑‑ it doesn't talk about two of the psychiatrists, but I'll flip this over here, get the guy's name. It was one of the witnesses, the two ‑‑ sorry, I'm looking for the guy's name. Cummings. Yes. Okay. They address Cummings, and they say in addressing the appointment, they say, okay, Cummings, we note all of his analysis, but then they go on to theorizing about posttraumatic stress, but then they go on to say conspicuously absent from the record is affidavit from Gentry claiming to have suffered from any of these symptoms. Several witnesses who testified at penalty phase didn't talk about Gentry's father's death, so they said that the family hadn't talked about it. He's a quiet child. No witness suggested he suffered from the symptoms Cummings described. And then they say, you know, the family members that they want to go track down in Florida, that's not ‑‑ you know, there hasn't been a showing of the need for that. Want to examine Gentry's school and criminal records. Now, what I didn't understand, both with ‑‑ well, certainly with Cummings, but both of them, when they say that it doesn't ‑‑ it isn't tied to a specific legal theory, I thought the motion was pretty clear that what they were talking about was ineffective assistance of counsel to make an adequate investigation for mitigation, and in fact, but that's what they then go on and address later on in their opinion. So that's what's troubling at least me in this case. Well, and it is troubling. But it's troubling in the sense, counsel, that they have addressed it on the merits. In other words, they have gone to the proper postconviction in their process, and what they've said is we don't see a basis for getting these psychologists at this point and going out and doing anything more, and based on what has been, as Judge Clifton said, presented to us out of the mouths of the trial counsel who did put in affidavits on other issues or Gentry who didn't say anything or the doctor that in fact was appointed, there's nothing there. So we haven't seen any showing on what's available. And under AEDPA, we're stuck with a record that was presented to the Supreme Court, unless there's some basis under which the factual predicate could not have been obtained at the time. So where does that leave us? Well, it leaves you, I think, where exactly where Justice Breyer said that some cases will end up in the pinholster concurrence, which is the opinion of the court really in pinholster, since he's the fifth vote for Part 2 of the pinholster decision. And what he says is there are circumstances where the district courts or the trial court or the state courts' adjudication will not be adequate. Why wasn't it adequate? If you listen to the rationale you just quoted, the rationale is not only inadequate, it's bizarre. Think about it in a simpler context. There's an alibi witness. Counsel doesn't investigate, doesn't find the alibi witness. So they say, well, I'd like an investigator because we think there's an alibi witness out there that wasn't looked at by the prosecution. And the court says, well, we've read the record. There's no mention of an alibi witness. Well, of course not, because counsel didn't put it on. But that's not what they're saying. At least one interpretation is they're saying you're making allegations, counsel, that you're going to put on a failure to investigate childhood mitigation evidence. And then they go to the record that's there, and they say, but you did, counsel did in fact retain an expert. But that's not true. There's three affidavits that say it's not true, and there's no evidence that says it is true. So there was no Dr. Wise? Dr. Wise was appointed, and they never had him evaluated. That's what the evidence is, the only evidence. I thought the motion said that they talked to him once, and then they never did anything. Well, that's not that there wasn't. They had no evaluation done. Well, okay, but there's no evidence in the record as to why not. That's available to make a proffer without having an expert to go to the counsel. Wait a minute. I want to understand the record, because what the Washington court is saying, you're claiming ineffective assistance of counsel on a number of issues, a failure to get forensic witnesses, and then also this mitigation. You put in declarations from those lawyers responding to the other experts, but they don't say anything about what they did or why they didn't put anything on. So, you know, that's not a factual predicate gap that wasn't closable, I would submit, at the time that this motion was presented to the Washington Supreme Court. Now, it is true they may have wanted, you know, another expert to come in and say, you know, had they done this, they would have been able to generate this kind of evidence about childhood and so on and so forth. But the predicate for the claim seemed to be that they hadn't done anything, and the Washington court is saying, A, you did get your expert, you did talk to them, but they didn't put them on. And there's no suggestion or information from the counsel that you've used for other IAC claims as to why that happened, strategic decision, big screw-up or whatever. So what do we do with that kind of a record? Well, I think if you're going to reach the issue, you have to remand it, because this is the kind of thing that has to be sorted out in the district court, because it's very complicated as to what was and was not in front of the Washington Supreme Court. It's not clear at all, and the district court has never made any findings about that subject. But one thing that was there is a declaration from Robert Mahler, who said, who is an expert. Neither of these lawyers had expertise or any consequence at a penalty phase of a capital case, the trial lawyers, but Robert Mahler did, and he said in his declaration, I talked with these lawyers and told them that they needed to do this mitigation work, and they didn't. So that evidence was there, but remember what the Washington Supreme Court said in its order of April 16th of 1995. It said that the petitioner was supposed to put in evidence of why mitigation evidence would be relevant, why psychiatric mitigation would be relevant, and they did. They put in two declarations of experts, Harris and Cummings, and they put in Mahler, all saying it's relevant. And I think, Your Honor, with all due respect, if you look at the many, many, many cases that this court has found in effective assistance of penalty, in almost all of them you will find a similar record. Counsel, I've written opinions on some of them, and I'm comparing it to those records. And in many of those cases, there was some little bit of family testimony that was provided. But there was also evidence put in from the attorney at the trial counsel about what they did or didn't do, what their rationale. They'll either come in and say, yes, I should have done that, or they'll come in and say, look, it was a strategic decision. They could have, if there had been some kind of an evidentiary hearing, if there had been some opportunity to develop it. Why were they able to put in affidavits on the other decisional points they made about forensic witnesses? I don't know the answer to that question. That's what you think would have to be developed on remand? No, I think that what the guilt phase declarations from these counsels say is, we realized we blew it. We concentrated too much on DNA. We didn't deal with these other aspects. But they don't talk about penalty phase at all. These guys didn't know how to do a penalty phase. According to this, they didn't do anything. Now, we don't have a full record. But why in the world would you have a psychologist appointed to evaluate your client and not have him evaluate him? That's the evidence. Is there a strategic reason for that? Is it explicable? Mueller says no. And I think the cases of this Court say no. How can you possibly not have a strategic reason for that? And how can you presume a strategic reason when all the evidence is that they should have done this and they didn't do it? I'm sorry. As I understand this, the ineffective assistance claim at the penalty phase,  the part relating to the experts and the part relating to the childhood, family, general mitigation, the Washington Supreme Court's decision specifically references the expert declaration, the need for an expert, and addresses that. But it doesn't really say much about the other part of the mitigation evidence. Do you understand the Court's ruling to encompass all parts of the IAC ineffective assistance claim? You know, I don't understand the Court's ruling, frankly. And, again, it's because it is this hybrid of a procedural ruling with regard to funding, which the bottom line of the rule is we don't, and strangely they said, we don't have any funds to pay for this kind of stuff, even though they had a rule that said they did. But they said, well, that rule was passed after this case came here. What the explanation for that is nobody's ever said. There is a declaration, a quite extensive one, from Julie Spector, who is now a Superior Court judge, who is one of Mr. Gentry's post-conviction lawyers, talking about her difficulties in trying to investigate background herself, saying that she needed an investigator, explaining why that is done as it has been done in the Wiggins case. In many cases from this Court and the Supreme Court of the United States have said that that's necessary. And the Washington Supreme Court just says, well, we don't have money for that. And, look, there was this mitigation, and we think that maybe this psychiatrist who was appointed actually did evaluate him, even though the declaration states that. But I just want to understand, if it's your position now, that all aspects of the IAC claimant penalty were presented and ruled upon by the Washington Supreme Court? And, again, this is where we get into the technical habeas stuff. Or is it just that the expert was fairly presented and exhausted and addressed by the Washington Supreme Court? Fairly, yes, to all those. But where we stop, and the critical place we have to stop because of pinholster, is they were not adjudicated on the merits. There was no adjudication. My position is that, given all these circumstances that took place before the Washington Supreme Court, that there's still room within pinholster for you to try to present additional evidence in federal court regarding ineffective assistance of counsel. Absolutely. First, we have to figure out what was before the state Supreme Court, and that is not going to be an easy task on remand. And then, second, we have to determine whether there was, and I think this court can determine whether there was an adjudication under the Halsey case, which is just from last month out of Nevada. This is clearly not an adjudication on the merits. The court said, well, we're not reaching the merits. We're at a passive merits. We'll talk about it for future reference. It's a very strange hybrid ruling and not, I think, an adjudication on the merits. And then, even if it is, then the question is whether there's basis for expanding the record under the concurring opinion in pinholster by Justice Breyer, which I think is what states the law as it now stands. But I think it would be, in terms of any kind of equity, if there's anything left. Okay. Let's save that part for you. You can have some time for rebuttal, but let's hear from the state. May it please the Court, I'm Paul Weiser, and appearing with me today is Greg Rosen, Assistant Attorney General on behalf of Appellee Sinclair. We're going to ask that the Court affirm the district court's decision dismissing Mr. Gentry's habeas corpus petition. Now, with respect to the Brady and Nephew claims, those claims were adjudicated on the merits by the Washington Supreme Court in connection with Mr. Gentry's personal restraint petition. And it's true that the district court and Washington Supreme Court were not in agreement in all respects on the facts of those claims. And, in fact, the district court concluded that there were two items of potential impeachment evidence that were not disclosed to the defense that should have been and disagreed with the Washington Supreme Court in that regard. But they ultimately came to the same conclusion, both the district court and the Washington Supreme Court, that there was not a real Brady violation because the information that was not disclosed in this case was not material in a Brady sense. And we're reminded that under the Supreme Court's decision in Strickler v. Green, there never is a real Brady violation unless the nondisclosure was so serious that there's a reasonable probability that the suppressed evidence would have produced a different verdict. And further complicating this case is the fact that this is a case under Section 2254D. So the Washington Supreme Court's decision is pivotal in this. Ultimately, the district court concluded that the Washington Supreme Court's decision was a reasonable one under Section 2254. I always have this problem when we're trying to assess the impact on the jury and whatever, and the state comes in and says, well, yes, if there was a mistake, but it wasn't prejudicial. And yet, as counsel has argued, and you can take issue with his characterization of how it was argued by the prosecutor, but the prosecutor cites the evidence that is now being said not to be material and emphasizes it during close. And that's what the jury hears, and not only does it hear it, it hears it because the state has the last word on it. And so the jury goes into the jury room with endorsements of these witnesses as the proof, and then it gets over to us and they say, well, you know, it wasn't all that material. He was impeached on lots of other grounds. So what do we make of that? Is he correct how much the prosecutor emphasized these informants and the police officers? I respectfully disagree with counsel's characterization of the evidence here. What was central in the case, what was concluded by the Washington Supreme Court and the district court to have been central in this case was the DNA and serological evidence. That consumed the vast majority of the testimony, the testimony of a number of experts on both sides, pointing out that there was a double transfer of DNA, the hair that was transferred to the victim's clothing, the blood that was transferred from the victim to Mr. Gentry's shoes. That was the centerpiece of the trial. There were also eyewitnesses who placed Mr. Gentry at or near the scene of the crime on June 13, 1988, a gentleman by the name of Fred Buxton, who was riding a mountain bike through the trails at the golf course, saw Mr. Gentry at approximately 5.30 p.m. in the very same area where Cassie Holden's body was found, approximately 148 feet removed from the trail. And then there were some neighbors of Mr. Gentry's who didn't know Mr. Gentry but saw him walking towards the golf course that afternoon. They put it in the time frame of between 4 and 6 p.m. And Mr. Gentry really stood out that day because it was a very hot day, but he was wearing a sport coat, long pants, and this distinctive cap that several people saw him wearing. So the eyewitness testimony placed him at the scene of the crime, and there was the DNA transfer, the double transfer from the victim and from Mr. Gentry. That was the central evidence in the case. So all that boils down to is they saw this black person in these clothes, and he was in the area. So what linked him then to the actual crime was the DNA evidence. That's correct, Your Honor. So if you had not put on, if the State had not put on any other evidence of these other folks, it's your contention that that was strong and overwhelming evidence. Yes, Your Honor. The eyewitness testimony has some problems with it, but we'll assume just for our discussion here that that's fine, and so, yes, he was in the area. But to link him to this horrible murder is a big step, correct? That's correct, Your Honor. And to make sure just because he was in the area, he's really the guy who did it because there are probably lots of other people in that area. That is correct, Your Honor. Although it was an area outside of town and it was near a golf course, it wasn't a particularly thickly populated area. But if it were just the testimony of the eyewitnesses placing him near the scene, that would not be very much. But the DNA evidence was absolutely pivotal. It showed that Mr. Gentry, in fact, came into contact with the victim, and, in fact, some of the victim's blood remained on his shoes. That was powerful. That was compelling evidence. If the prosecutor did go on to offer up this additional evidence, why shouldn't we accept the fact that the prosecutor felt he needed to do it, that it must have counted for something? Your Honor, I think Mr. Moran, who was the deputy prosecutor who testified at the evidentiary hearing below, said we had this evidence and we didn't want, after the fact, to regret the fact that we didn't present everything that we had, so we put in all the evidence that we had. He didn't think it was particularly powerful evidence, but he thought that it was something that owed to the case, owed to the victim, to present all of the available evidence. To emphasize that, I may have been confused, I think it was Hicks wasn't receiving any benefit, but, in fact, he clearly was receiving some sort of benefit, and at this point it doesn't appear to be contested that that information should have been turned over and that the State's argument may, in fact, have been false with respect to the question of whether he had received any benefit. Well, he goes to the trouble of making that argument, why should we say he was wasting his time? Your Honor, I don't know that you should say he was wasting his time, but I think the Court can agree with the District Court that, in perspective, that was a mere token benefit. No sentence was shortened, no charges were dropped against Mr. Hicks, and he went off to prison. This is much of a benefit, but to emphasize he's getting no benefit when, in fact, there's at least something that's been done for him that wouldn't have been done otherwise. There's some tension there, and why should we conclude the tension doesn't matter if the prosecutor himself is the one who insists he received no benefit? Because, Your Honor, the materiality standard requires that the nondisclosed evidence create a reasonable probability that there would have been a different verdict, and we just can't conclude under this record that the verdict would have been different had that information been disclosed. We have to remember what happened to Dieste and Hicks when they were on the stand. As Mr. Moran described it, they were eviscerated. Dieste, despite the fact that hearing that Mr. Gentry was admitting to having committed this crime was devastating and bothered him, I waited nine months before he reported it, and also he had an extensive criminal record that counsel went after, and he repeatedly used racial slurs and epithets, so there's a potential of racial bias that they were able to use against Mr. Dieste. He's the one that testified that Gentry referred to the victim as a bitch, right? I don't think he was the only one, Your Honor, but that is correct that that was in his testimony, and in fact the defense went after him with the fact that that did not appear in his pretrial statement in his interview with Detective Wright, and the supposition, or at least the suggestion, that perhaps this was a recent fabrication on his part that Mr. Dieste was coming up with this word at the last minute. Did that word have any impact on the penalty for you? I can't say that it didn't have any impact. I know that during the closing argument in the penalty phase, that word was mentioned once. It was mentioned around the same time that there was the discussion. But in the guilt phase? In the guilt phase, there were several mentions of that. In fact, when the prosecutor was recounting the testimony that was presented at trial, naturally that came up because that word came up in connection with Dieste. It came up in connection with Tim Hicks, and it also came up in connection with Leonard Smith because each of those men reported that Mr. Gentry used that word in describing the victim. But with respect to Hicks, it was not only his extensive criminal record that was used to impeach him, but defense counsel went after the underlying facts of some of his crimes. For example, the fact that he used a shotgun, which Mr. Hicks was claiming was an inoperable shotgun, but they used a shotgun in carrying out one of his crimes. Hicks also had a habit of using multiple aliases, and then he also had his prior conviction for first-degree perjury in the very same courtroom and before the very same judge that he was then appearing, and I submit that that's an extremely rare occurrence that you get a witness like that that is just blocking impeachment. And the district court correctly characterized the benefit that Hicks received. It was a benefit in a sense because his parole status was clarified and he had the peace of mind of knowing that he was not going to be serving a consecutive sentence following the conclusion of his current sentence at that time. But it was not the type of benefit that would undermine his credibility. That was the district court's assessment. Because no sentence was shortened and he was going back to prison after this was done. On Hicks, did the Washington Supreme Court ever address the question of materiality or did it just jump to the lack of prejudice? Was that with respect to Hicks? With Hicks. I believe that there was a discussion of all of those witnesses and it was done with the materiality standard in mind, if that responds to your question. That was my question. One additional item of evidence that was presented at trial to show that this was also not a material violation, Gentry's post-crime conduct was suspicious. And, again, this is not enough to convict a person, but this is something that points the finger at Mr. Gentry. His sister-in-law, Juliet Gentry, he was residing with his brother and his sister-in-law at the time of the crime, saw him around the time of Cassie's disappearance conspicuously washing his shoes off in the sink, indicating that he was probably hoping to remove blood, or at least the inference is that he was trying to remove blood from those shoes. The fact that shortly after the crime, he started growing a beard. He had been clean-shaven on June 13, 1988. By June 23, he got fired from his job with a catering service at a hotel because he refused to shave and they had a policy with his employer that they were to be clean-shaven. It meant enough to him to grow a beard that he was willing to lose his job to do that. Just two days after the murder, when a story appeared on the discovery of Cassie Holden's body, on June 15, Mr. Gentry happened to accompany his sister-in-law to the babysitter's house to pick up the kids, and the babysitter mentioned, Cheryl Gwin was her name, mentioned that there was this description of what the crime scene was in the discovery of this little girl's body because Juliet had indicated some interest in the crime before that. And Mr. Gentry walked around Juliet, snatched the newspaper away from Ms. Gwin, and went over to the couch and carefully studied this newspaper. Before doing that, he asked Ms. Gwin, did they have any suspects? Did they have any clues? So he had a keen interest in what the police investigation was of this crime. And then we know that when he was interviewed by the police, he lied about whether he even knew where the golf course was. Of course he knew where the golf course was. He lived right near it, and his brother and his sister-in-law, when he came to Washington in April of 1988, drove him around the neighborhood and pointed out the golf course to him. So he knew that. So his post-crime conduct was very suspicious, and that's part of the evidence that needs to be considered in deciding whether the added impeachment or the additional impeachment evidence of Deisty and Hicks was material. The jury likely didn't put much stock in the testimony of these jailhouse informants. And, in fact, we know that from Hicks' testimony, Hicks testified that Gentry said he had sex with the victim. But the jury acquitted Gentry of having committed a rape and concluded that there was only an attempted rape, and that was a point that the defense conceded all along. The defense obviously didn't concede that Mr. Gentry was the culprit, but the defense agreed that the circumstantial evidence indicated that this was a murder that occurred during the course of an attempted rape. And the jury acquitted Gentry of having a completed rape, despite what Mr. Hicks said in his testimony. Can you address the question about ineffective assistance of counsel on the penalty phase with the strange combination in the Washington Supreme Court where they defer ruling on a motion for hiring investigators and experts and then fold it into their final ruling? It's a little confusing to me. As I pointed out, what's confusing is they address in their opinion, they address the issue of getting an appointment of this expert Cummings, at least, where they say, and it says what it's about, that he could determine whether Gentry suffered from post-traumatic stress syndrome. But then at the end of that it says even if he could do so, that conclusion is not grounds for relief because it is not tied to a particular legal claim. Well, the motion presents it as we want to do a mitigation defense for ineffective assistance of counsel, and what we need to do to show that is we need expert testimony and we need investigators. So I don't understand. I certainly understand we're bound to give deference to factual findings and all of that, but it's a little strange, particularly since the motion on its face explains precisely the legal claim that they want to make. What the Washington Supreme Court was thinking of, because then they go over later on and say, well, we don't think that there's any basis for finding ineffective assistance of counsel, because you haven't put on any evidence about what was going on between the counsel and the expert that they did get, and there's no evidence from Gentry himself and so on and so forth. So they obviously knew that there was an ineffective assistance of claim for failure to hire an expert or consult or use an expert. What do we make of all that?  I'm concerned that this claim was not fairly presented to the Washington Supreme Court. What claim was it? The ineffective assistance of counsel for failure to present mitigating evidence, psychological evidence in the penalty phase. Well, they put it before them in a motion for these, and the Washington Supreme Court combined its ruling. I mean, what more could we say? They didn't have a fair opportunity when they discussed it on both the procedural motion and on the merits of the claim? Well, I think, Your Honor, it was not presented in a way that it was a substantive claim for relief, ground for relief. We have to remember that Gentry made several, and this is part of the problem. Well, but counsel, wait a minute. Let's just take a step back. They said in their motion, what we contemplate doing is making a claim for ineffective assistance of counsel for failure to do mitigating evidence, evidence of post-traumatic stress syndrome. That's what our claim, but what we need to do in order to present the claim is get an expert, and we need some investigation. And the court says, sorry, we don't see any need for it, and it's not tied to any legal claim. And then they come along later in the opinion and say on ineffective assistance of counsel, counsel weren't ineffective because they did get an expert. So I don't understand when you say it wasn't fairly presented. Particularly if we're supposed to defer to their factual finding under D-2 as an unreasonable or, you know, as a reasonable determination of the facts. Are you just saying, you know, I'm not following either their reasoning or yours at this point. Your Honor, my reasoning, and I hope I am able to state this cogently and coherently, the point that they made to the Washington Supreme Court was presented in sealed and ex parte motions for procedural relief. Who cares whether they're sealed or ex parte? The state cares, Your Honor. Well, but the state, you know, this is the Washington Supreme Court making a determination of what the facts are. They have to decide. They make rulings all the time based on ex parte motions, and they have the information. I guess this question is fairly presented to the court, not to the state. The question whether you had a chance to argue it as the state doesn't seem to, isn't the point, is it? Well, the Washington Supreme Court, Your Honor, is not going to decide an issue in a vacuum where only one side is able to present facts. Well, then they could. They did. They did decide. They denied the motion. They refused to provide funding for the additional investigation. So how can you tell me they wouldn't decide it? They did. They decided the motion, Your Honor. And they decided it on the merits. They come along later in the opinion and say no ineffective assistance of counsel because he didn't put forward enough evidence. Because he didn't put forward enough evidence in support of his specific claim. And we have to recall what claim was put before the court. Our brief sets out the two-paragraph very conclusory and very vague argument that Mr. Gentry put before the Washington Supreme Court. There were no specifics in that. I think what you quote, they acknowledge that based on the information they have at the time, they can't make out a case that satisfies the prejudice prong under Strickland. That's why they're asking for the opportunity to conduct additional investigation. But unlike the other two claims that Mr. Gentry had submitted of ineffective assistance of counsel in that same personal restraint petition, the other two being the counsel's failure to review the jury instructions and propose alternate jury instructions, and then also counsel's failure to move for a redaction of the rape judgment and sentence, this third one, the third claim, the allegation, did not allege any specific facts. And the declarations from defense counsel, from Mr. Robinson and Mr. Leatherman, were totally silent with regard to this one allegation. And there was no declaration from Dr. Wise, the expert who had been appointed at the Superior Court level in 1990 or 1991, whether he evaluated Gentry or not. Now we have affidavits from other people who indicate that that didn't happen, but we didn't get anything from Dr. Wise himself, and we didn't get anything from the former defense counsel themselves about that. Could you clarify one thing for me? At the time the Supreme Court had, the Washington Supreme Court had these motions in front of it, what was the state of the law in Washington about the court's authority to authorize funding for these kinds of requests? I think, Your Honor, at that time in 1996, the law was clear that the Washington Supreme Court could authorize funding for investigations for expert services. Mr. Gentry- We have rules, but what kind of showing behavior the petitioner would have to make? I don't know that the rules were so clear in the- there were some court rules that were adopted after Mr. Gentry's case was filed, but the rules existed in draft state. The state made the offer in 1996, and this is mentioned in the affidavit or declaration of Pam Leginski, which is in the supplemental excerpts of record. The state made the offer to Mr. Gentry to have the case decided under the new rules, which would have been clear and would have set out standards for what needed to be shown in order for investigative services or expert services to be granted, and Mr. Gentry especially declined that offer. So he preferred, I guess, the law less clear as it was before the adoption of the rules to what he would have received under the rules. So it was just a highly discretionary matter with the Washington Supreme Court? Yes, Your Honor. They had the authorities up to their discretion. They made these motions, and ultimately- Yes, Your Honor. They ruled on the merits of the petition.  That's my understanding, Your Honor. As Judge Fischer points out, they went on to decide. It looks like the merits as well. I mean, they cite Strickland. That's correct, Your Honor. Failing to present psychological evidence and mitigation, and to prevail, what they have to show is, and then cite Strickland. That's correct, Your Honor. So what they said, based on what we have before us, we don't find that there's any failure on the part of counsel to carry out their Strickland duties. They don't get to the prejudice ground, obviously, because they find no attorney, you know, substandard performance at all.  And so there's sort of a catch-22. Back in the earlier part of the opinion, they're saying, well, we don't see any legal claim that your request for an expert to look at mitigation evidence ties to, even though it was presented in support of a claim for ineffective assistance of counsel to do an adequate investigation on mitigation. So on the one hand, they say there's no legal claim, and a few pages later in the opinion say, and on the claim of ineffective assistance, there's not enough evidence. So that's why I'm having trouble with this. You know, if we say, well, we're stuck under, we have to look only at the evidence that was before the state court under the pinholster standard, okay? If the state court declines to give the defendant the opportunity to develop the evidence so that it can make a fair assessment of the factual underpinning of the claim, why doesn't that then give us the authority under 2D and under the evidentiary hearing standard to say, this comes within the prong where the defendant was not able to develop the factual record? He tried, and the state prevented him from doing so. I disagree with the court on the premise that he was denied any opportunity. He did receive $171,000 in the processing of his personal restraint petition for attorney's fees and for out-of-pocket expenses. So it wasn't as if the defense was denied the opportunity to present any evidence. If you look at the actual motions that Mr. Gentry put before the court in connection with his personal restraint petition, the sealed and ex parte motions, they don't contain any affirmative allegations of mental illness. They're all couched in terms of the investigation may reveal the following. They allege the probable mental illness, and that was a quote, probable mental illness stemming from possible or probable sexual molestation. Your Honor, they could have presented a declaration from Gentry himself verifying some of these allegations that are made about him. Did they put forward Cummings? Was it Cummings? Is that the fellow? Yes, Your Honor. And it was Dr. Cummings and Dr. Harris, and both of them were speculating what the evidence might show. What are they going to say? They haven't interviewed the fellow. They haven't, you know, done their psychological testing or whatever they do. But the whole purpose for the psychological testing, Your Honor, would be based upon the sexual molestation of Mr. Gentry, and it was nothing more than possible, and it was counsel's speculation that that may have occurred. There was nothing from Mr. Gentry saying, in fact, some of these things did happen to me. That would have gone a long way towards showing whatever his mental illness or – So your bottom line position here is just that these were procedurally – they weren't fairly presented, time-barred, procedurally defaulted, and distorted. That's correct, Your Honor. That's not incredulous, I guess. The allegations, Your Honor, that he presented to the federal court, the specific allegations of specific mental illness, frontal lobe brain damage, post-traumatic stress disorder, speech dyspraxia, dysthenia, severe learning disorder, none of that appeared in the sealed ex parte motions that were presented to the Washington Supreme Court. He never got very specific at all. And there's never been any explanation why, when the Washington Supreme Court issued its decision in February of 1999, on the record that they had before then, why eight months later – Are these the personal restraint petitions? That's correct, Your Honor. That's when the personal restraint petition was decided. Eight months later, he files his federal habeas corpus petition after having been granted a stay of execution, and that's where these allegations appear for the first time. The speech dyspraxia, the dysthenia, the frontal lobe brain damage, that was never presented to the Washington Supreme Court. So that's why we say that this claim largely was not presented to the Washington Supreme Court. He did present a small shred of it, and that was the rather conclusory claim that he made to the Washington Supreme Court in his personal restraint petition about the lack of a mental health investigation by defense counsel. I see that my time is up. If I could have a moment just to address the ex post facto claim. Briefly. I'll do so. Nothing about the Washington victim rights amendment violated anything in Calder v. Bull. I point out first that Calder v. Bull was not the ex post facto clause itself. It was a seriatim opinion of Justice Chase way back in 1798. The gentry never cited to Calder v. Bull, and he certainly never relied upon the fourth prong of Calder v. Bull before the Washington Supreme Court. And nothing about Mr. Holden's testimony or the admission of Mr. Holden's testimony during the penalty phase changed either the quantum of the evidence necessary to obtain a conviction or death sentence, and it didn't subvert the presumption of innocence. I would point out also that Washington law prior to Mr. Gentry's case, the specific cases that counsels referred to, State v. Bartholomew, was not concerned with victim impact testimony. No case law prior to Mr. Gentry's case said that RCW 7.69030 was limited to non-capital cases. So we believe there was no ex post facto violation in Mr. Gentry's case. If the court has no further questions for me, I'd appreciate it if the court would affirm the district court's decision. Thank you. I'll give you a – try and keep it within five minutes. I can do that, Your Honor. With regard to the Brady and the Pui issues, again, these jailhouse informants like this always have criminal records, and they can be brought out at trial, and that was exactly why the prosecution said, but wait a minute, Hicks, Dicey, they're not getting anything. They're not asking for anything. They're here because they're horrified too. It was just exactly to try and nullify that impeachment that this misrepresentation was made, and this is not just a Brady violation. It's a Napui violation. It is false testimony, deliberately false testimony. The prosecutor who said those words to the jury knew it was untrue. He had contacted the board after Hicks had said, I won't testify unless you do this for me. Did the Washington Supreme Court address materiality in the context of Napui, or was it only in Brady, if at all? They just generally said, well, there was a lot of impeachment, and this wouldn't have made that much difference. I think that they specifically said that because they decided for themselves that the Indeterminate Sentence Review Board had reinstated Hicks for other reasons, and therefore this was irrelevant, and, of course, that's contrary to everything that goes back to Bagley versus the United States, which says it doesn't matter if the prosecutor can deliver. I think in the CVAC case, this court says sometimes it's even more important that the prosecution doesn't have a binding promise because then there's this threat out there. But the Washington Supreme Court said, well, the board really did this, they say, for other reasons, therefore this is not, I guess, material or prejudicial. It's kind of the same thing in this context. So I don't think that they made a clear description of either of those things, and certainly what they did was contrary to governing the United States Supreme Court on Bagley, and then on Hicks with regard to whether this kind of a benefit is something that has to be disclosed under Brady or something that matters under Napui, and also with regard to Dieste, that being a paid informant of the police is impeachment. That goes back to Onley versus United States back in 1952. The Supreme Court has said this many times. In federal court, you get instructions. In Washington State Court, we have a prohibition on judicial comment on the evidence, so the jury is given nothing to tell them to watch out for these kind of informants, and they're told by the prosecutor, I say these guys aren't asking for anything, therefore, despite their criminal records, please believe them. And it did matter. Mr. Buxton, the other evidence, at best, went to involvement in the crime. Mr. Buxton, however, the counsel cited, if you look at page 7775 of the state record, and we've said it in our brief, he never identified Jonathan Gentry. He was specifically asking court, can you identify Jonathan Gentry? He said no. He saw a black man who made a composite that doesn't look anything like Jonathan Gentry. It's in the record somewhere, but he said at trial, I can't recognize him. I've seen photographs. I can't recognize him. So that was very much in doubt, and so was this DNA evidence. It's a very thin case. That's why they brought these three jailhouse informants into it, and those informants not only went to guilt and involvement and the confession, the most powerful kind of evidence you can have against a defendant for guilt, but also premeditation, which was very much at issue in this case. Premeditation in Washington is very demanding. Circumstantial evidence does not always establish it. And the aggravator, which is a very strange verdict in this case, because the jury found that this crime was not committed in the furtherance of a rape, but counsel says it was an attempted rape. I don't know how that can be. The jury never said what it was, just some crime was being concealed or his involvement was being concealed. Very questionable finding. And then penalty, because of this bitch word, repeated 13 times in closing argument at guilt, and the final words, some of the most devastating words I've ever seen in a capital sentencing argument, that the defendant contrasting, as Justice Sanders said, this horrible word bitch with a 12-year-old girl out picking flowers. And if there was ever anything that would sway the last juror, that was it, and they knew it. And that's why they did it, and they did it very deliberately, and it had a prejudicial effect down the road. With regard to the ineffective assistance of counsel on penalty, I'm sorry. If you look, I look back at pages 212 through 13 of the excerpt of record, I think it is quite questionable as to whether the Washington Supreme Court ruled on background investigation at all. They say that they asked for background investigation. They say they don't tie it to a claim, which is clearly not correct. And then they talk about the fact that there was some background testimony, and then that's it. They don't really say what their disposition is. They do say, however, Deny gentry's motions for discovery and appointment of investigators or experts. They do, and then they say, actually, the next thing I was going to say, at footnote 5 on page 212, they say their rule that allows for funding doesn't apply. Therefore, they have, quote, inherent power to do something, and that's all they're relying on, and there are no rules and there are no standards. But if you look at, we quote on our reply brief or a brief at page 16, if you can find it in the excerpt of record at 1144, what they told post-conviction counsel is, show us why a psychiatric evaluation would be relevant. They didn't say, show us why it wasn't a tactical decision. They didn't say, show us something else, whether Mr. Gentry writes something saying he's mentally challenged or something. They said, show us why psychiatric evidence is relevant. That was the only guideline counsel had, and they complied with that actually within six days. On the 22nd of April, they put in a psychiatric affidavit, an expert witness affidavit, affidavits of counsel, and a memorandum on the law, and then that was the last they heard until they said, denied, you haven't shown us whatever it was the court wanted to see. So I don't think that that is a fair adjudication. It certainly is not a default finding as the district court found. It is something that would require remand if the guilt predictor is not reversed under the grounds. Thank you. Thank you, counsel. Thank you both. It was a well-argued case. We take these cases obviously very seriously. That's why it's the only case being argued today. So we appreciate the time all of you have put into it. The case is submitted, and we'll stand adjourned.
judges: Fisher, Paez, Clifton